IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Ivan MONZALVO LAZCANO, Fernando MONZALVO LAZCANO, and Paige MONZALVO LAZCANO, individually and as next friend of D.D., R.D., and D.M., | ) ) ) ) ) | No: 1:18-cv-02784 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | COMPLAINT |
| Trooper Shane M. MORROW, in his individual capacity, | ) ) ) | DEMAND FOR JURY TRIAL |
| Defendant. | ) | |

## I.  INTRODUCTION

1. This is an action for money damages brought to challenge the unconstitutional stops and detentions conducted without reasonable suspicion or probable cause by Shane M. Morrow, a State Trooper for the Ohio State Highway Patrol ("OSHP").  Plaintiffs were targeted for these unconstitutional actions solely on the basis of their and/or their family members' Hispanic/Latino ethnicity and perceived national origin.

2. Plaintiffs Paige Monzalvo Lazcano, Ivan Monzalvo Lazcano, Fernando Monzalvo Lazcano, D.D., R.D., and D.M. bring this lawsuit to seek damages for Defendant's violation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.

1

3. As described below and as captured by dashcam video, on November 1, 2017, Trooper Shane M. Morrow was patrolling Interstate 71 near Mansfield, Ohio when he initiated an unconstitutional seizure of Plaintiffs Paige Monzalvo Lazcano, Ivan Monzalvo Lazcano, Fernando Monzalvo Lazcano, Paige's daughters and Ivan's stepdaughters D.D. and R.D., and Paige and Ivan's daughter D.M. In violation of the Plaintiffs' rights under the Fourth and Fourteenth Amendments, Defendant Morrow 1) stopped and detained Paige, Ivan, Fernando, D.D., R.D., and D.M. without any reasonable suspicion of unlawful activity meriting a traffic stop while Paige, who is Non-Hispanic White, was driving the family northbound on I-71; 2) detained Paige in the back of his patrol vehicle and separated her from her young children for approximately forty minutes without probable cause; and 3) without probable cause or reasonable suspicion, seized Ivan, Fernando, D.D., R.D., and D.M. in the vehicle in which they had been passengers while he questioned Paige, contacted the United States Border Patrol, and waited for Border Patrol agents to arrive. Defendant Morrow made these unconstitutional seizures after seeing Ivan in the vehicle, recognizing the Hispanic/Latino ethnicity of Ivan and the other passengers, and then following and monitoring Plaintiffs for several miles thereafter until initiating the stop.

4. As a result of Trooper Morrow's prolonged detention of all six Plaintiffs, Ivan was apprehended by the Border Patrol, detained in ICE custody at the Seneca County Jail for approximately three weeks, and placed in removal proceedings in Immigration Court. Paige, Fernando, D.D., R.D., and D.M. were forced to watch their husband, brother, father-figure, and father, respectively, as he was questioned, searched, and detained by Defendant Morrow and then Border Patrol. Because of the detention, Fernando nearly missed his immigration court hearing, the consequences of which are a removal (deportation) order *in absentia*.

2

5. All six Plaintiffs now seek to vindicate their constitutional rights to be free from unlawful detention on the basis of their and/or their family members' race, ethnicity, or perceived national origin and unlawful prolonged detention by a state trooper who has no authority to enforce civil immigration law.

## II.    JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 1983. Because this lawsuit alleges violations of the United States Constitution, it raises questions of federal law.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of these events giving rise to this claim occurred in the district and because Defendant Morrow resides in this district.

8. Venue is proper in the Eastern Division, in the Cleveland divisional office, pursuant to Local Rule 3.8 because the transactions and occurrences giving rise to these claims transpired in Richland County.

9. This action is timely because it was filed within two years of the alleged misconduct, as required under Ohio Revised Code § 2305.10.

## III.    PARTIES

### Plaintiffs

10. Plaintiff Ivan Monzalvo Lazcano is of Hispanic/Latino race and ethnicity. He currently resides in Columbus, Ohio with his wife, Paige Monzalvo Lazcano, and their three children, D.D., R.D., and D.M. After his apprehension by Trooper Morrow and subsequent apprehension by Border Patrol, Ivan Monzalvo Lazcano was detained in ICE custody at the Seneca County Jail in Tiffin, Ohio. The Immigration Court ordered him released on a $10,000

bond. He was released three weeks after his detention by Trooper Morrow. He is currently in removal proceedings at the Immigration Court in Cleveland, Ohio.

11. Plaintiff Paige Monzalvo Lazcano is Non-Hispanic White. She currently resides in Columbus, Ohio with her husband, Ivan Monzalvo Lazcano, and their children. After her apprehension by Trooper Shane M. Morrow, Paige Monzalvo Lazcano was issued a warning for following too close to the car in front of her and released.

12. Plaintiff D.D. is of Hispanic/Latina race and ethnicity. She is nine years old. She currently resides in Columbus, Ohio with her mother, Paige Monzalvo Lazcano, her stepfather, Ivan Monzalvo Lazcano, and her sisters, R.D. and D.M. After the apprehension by Trooper Morrow, D.D. was released to her mother.

13. Plaintiff R.D. is of Hispanic/Latina race and ethnicity. She is six years old. She currently resides in Columbus, Ohio with her mother, Paige Monzalvo Lazcano, her stepfather, Ivan Monzalvo Lazcano, and her sisters D.D. and D.M. After the apprehension by Trooper Morrow, R.D. was released to her mother.

14. Plaintiff D.M. is of Hispanic/Latina race and ethnicity. She is four years old. She currently resides in Columbus, Ohio with her mother, Paige Monzalvo Lazcano, her father, Ivan Monzalvo Lazcano, and her sisters D.D. and R.D. After the apprehension by Trooper Morrow, D.M. was released to her mother.

15. Plaintiff Fernando Monzalvo Lazcano is of Hispanic/Latino race and ethnicity. He currently resides in Columbus, Ohio, with his brother, Ivan Monzalvo Lazcano, and Ivan's family. Fernando is currently in removal proceedings at the Cleveland Immigration Court and was on his way to a court hearing when he was detained by Trooper Morrow. After Fernando's detention by Trooper Morrow, he was released.

<u>Defendant</u>

16. Defendant Shane M. Morrow is a State Trooper for the Ohio State Highway Patrol.

17. At the time of the incident, Defendant Morrow was assigned to the Ohio State Highway Patrol's Criminal Patrol Unit.

18. Defendant Morrow is sued in his individual capacity and at all relevant times was acting under color of state law.

### IV. FACTUAL ALLEGATIONS

**A. Ohio State Highway Patrol**

19. The Ohio State Highway Patrol ("OSHP") is the state agency charged with providing statewide traffic services; statewide emergency response services and support services to the public and the criminal justice community; investigation of criminal activities on state-owned and leased property throughout Ohio; and security for the government and other dignitaries. Ohio Rev. Code § 5503.02(A).

20. OSHP is a division of the Ohio Department of Public Safety.

21. OSHP has jurisdiction on all public roadways within Ohio, as well as all state property.

22. OSHP troopers have the same right and power of search and seizure as other peace officers. A state highway patrol trooper may render emergency assistance to a peace officer who has arresting authority where there is a threat of imminent physical danger to the other peace officer, threat of physical harm to another person, or any other serious emergency situation; and either the peace officer requests emergency assistance, or it appears that the peace officer is unable to request emergency assistance and the circumstances observed by the OSHP

5

trooper reasonably indicate that emergency assistance is appropriate. Ohio Rev. Code § 5503.02(D).

23. OSHP officers must turn 21 years of age before the completion of training. They must be citizens of the United States. Applicants attend twenty-four to twenty-six weeks of what OSHP characterizes as "paramilitary" training at the Patrol Academy in Columbus, Ohio.

24. OSHP General Headquarters are located in Columbus, but the agency's jurisdiction includes the entire state of Ohio. The state is divided into nine districts and districts are subdivided into posts. Each district is commanded by a captain and each post by a lieutenant.

25. The OSHP does not have a written agreement with the United States Attorney General or Secretary of Homeland Security pursuant to which OSHP troopers or employees have been determined by the Attorney General or Secretary of Homeland Security to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of noncitizens in the United States (including the transportation of such noncitizens to detention centers). These agreements are commonly called 287(g) agreements.

26. The Criminal Patrol Unit of OSHP searches for criminal activity on Ohio roadways, with a special emphasis on drug trafficking.

27. OSHP has a policy, OSP-902.08, that purports to "provide guidelines for handing suspected illegal aliens and obtaining assistance from associated response agencies, i.e. the United States Immigration and Customs Enforcement (ICE) and/or U.S. Customs and Border Protection (CBP)."[1]

---

[1] U.S. Border Patrol is a sub-agency of U.S. Customs and Border Protection.

28. OSP-902.08 states as follows: "If any alien appears to be in illegal status, contact the nearest customs office by telephone. If an alien is detained for the purpose of ascertaining immigrant status, the unit making the stop should make the above contact as soon as possible. In most instances, the record can be checked and an immediate answer given about any 'wanted' file with I.C.E. If the customs office does not respond within a reasonable length of time, obtain suspected illegal alien's background data and forward to their office, to include any charges filed and incarceration information, if applicable. Do not detain them any longer if there are no charges."

29. OSP-902.08 further contains a section titled "Assistance and Support from INS."[2] This section includes a subheading called "Foreign Language Assistance," which states that "ICE/CBP agents speak various foreign languages and also have access to foreign language interpreters."

30. OSP-902.08 does not state, nor do any other OSHP policies state, how a trooper should determine whether an alien "appears" to be in illegal status, or what amount of time is "reasonable" for a trooper to wait for a response from CBP or ICE.

**B.     Events of November 1, 2017**

31. On Friday, November 1, 2017, Ivan Monzalvo Lazcano, Paige Monzalvo Lazcano, their three children, D.D., R.D., and D.M., (hereinafter "the Monzalvo family"), and Ivan's brother, Fernando Monzalvo Lazcano, were driving on I-71 from Columbus, Ohio, where all six reside, to Cleveland, Ohio, where Fernando was required to appear at an Immigration Court hearing.

---

[2] INS, which stands for Immigration and Naturalization Service, is an immigration agency that has not existed since 2003. U.S. Customs and Border Protection and Immigration and Customs Enforcement are currently sub-agencies of the Department of Homeland Security.

32. Ivan and Fernando are of Hispanic/Latino descent. Ivan speaks enough English to communicate but Spanish is his best language. His English is accented. Fernando speaks little to no English. Paige is Non-Hispanic White and English is her best language.

33. Trooper Morrow first started following the Monzalvos' vehicle when he saw that Ivan, a Hispanic/Latino male, was driving the vehicle. Trooper Morrow continued to follow the Monzalvo family as they proceeded north on I-71.

34. Around Exit 165 on I-71 North, Ivan and Paige exited the interstate and stopped at a McDonald's restaurant. The couple went inside the McDonald's to use the restroom. When they returned, Paige began driving and Ivan sat in the front passenger seat. Paige then drove the car to the I-71 northbound on-ramp and continued to travel to Cleveland.

35. While the Monzalvo family were at McDonald's, Trooper Morrow parked his vehicle at a "crossover" at or near I-71 Exit 165 and watched the family during the entire rest stop.

36. Once the Monzalvo family's vehicle resumed travelling on I-71 North, Trooper Morrow continued to monitor them from his patrol vehicle, which was stopped in a median facing northbound traffic on I-71.

37. At approximately 11:54 a.m., the Monzalvo family's vehicle passed Trooper Morrow's then-stationary OSHP patrol vehicle. After the Monzalvo family passed Trooper Morrow's patrol car, Trooper Morrow immediately began following them again. Paige's car was not following closely behind any other car, and it was not traveling at an unreasonably close distance behind any other car.

38. Paige was not exceeding the posted speed limit, nor was she driving at a speed unreasonably below the posted speed limit. The speed limit on the section of I-71 in question is

70 miles per hour. According to the video of the traffic stop, Trooper Morrow noted Paige was driving between 60 - 65 miles per hour.

39. In fact, as Trooper Morrow pursued the Monzalvo family, both the highway patrol vehicle and the Monzalvos' vehicle were passed by other vehicles traveling at much higher speeds. Video footage shows other vehicles following closely behind the vehicles in front of them that were not the subject of Defendant's attention.

*Unconstitutional stop of Plaintiffs' vehicle*

40. After Trooper Morrow followed the Monzalvo family for some time on I-71 Northbound, before reaching exit 165, and after Trooper Morrow watched the Monzalvo family stop at a McDonald's on exit 165 from a "crossover" on I-71, and after Trooper Morrow continued to follow them again on I-71 North for some time afterwards, Trooper Morrow's vehicle illuminated its light bars at approximately 11:57 a.m., signaling Paige to pull over the vehicle she was driving.

41. Paige pulled the car over to the side of the road. Trooper Morrow exited the OSHP patrol vehicle and approached the vehicle on the passenger's side door, where Ivan was sitting.

*Initial seizure of Ivan, Paige, Fernando, D.D., R.D., and D.M.*

42. Trooper Morrow crossed his arms and leaned against the passenger door. At times during the stop, Trooper Morrow leaned in so closely to the vehicle that the brim of his cap crossed under the window threshold into the passenger's side, where Ivan was seated.

43. Trooper Morrow asked Paige if she had identification, registration, and insurance. Paige produced a driver's license. Trooper Morrow declined to look at the license. Trooper Morrow stated that he had stopped her because she was following too closely to another vehicle.

9

44. Immediately thereafter and without explanation, Trooper Morrow asked Paige if Ivan was her husband and demanded Ivan produce identification.

45. Trooper Morrow then stated to Paige and Ivan that the reason the family had stopped at McDonald's was because Ivan didn't have a driver's license.

46. Trooper Morrow then asked Paige and Ivan if they were going to an immigration hearing and demanded to see their "paperwork."

47. Without explanation, Trooper Morrow then asked Ivan for Fernando's identification. Ivan presented Fernando's Immigration Court hearing notice (issued by the Department of Justice Executive Office for Immigration Review), as well as some other immigration paperwork. Trooper Morrow confiscated these documents.

48. Trooper Morrow inquired about the three children in the back of the vehicle, Plaintiffs D.D., R.D., and D.M. Specifically, Trooper Morrow asked "whose children" they were. Paige stated that all three were her children. Trooper Morrow immediately stopped that line of questioning.

49. At no point in her detention in the Monzalvo family's vehicle did Paige feel free to leave.

50. At no point during their initial detention in the Monzalvo family's vehicle did Ivan, Fernando, D.D., R.D., or D.M. feel free to leave.

*Seizure of Paige in patrol vehicle and prolonged seizure of Ivan, Fernando, D.D., R.D., and D.M. in Plaintiffs' vehicle*

51. At approximately 12:01 p.m., Trooper Morrow ordered Paige out of the vehicle she was driving. Trooper Morrow instructed the rest of the Monzalvo family to stay in the vehicle.

10

52. Trooper Morrow frisked Paige and ordered her to sit in the back seat of the OSHP vehicle with the drug-sniffing dog, who was barking aggressively.

53. At no time during Trooper Morrow's seizure did Paige feel free to leave.

54. At no time during Paige's seizure and their detention in their own car by Trooper Morrow did Ivan, Fernando, D.D., R.D., or D.M. feel free to leave.

55. As Trooper Morrow was putting Paige in the back of the patrol vehicle, D.D., R.D., and D.M. began to panic. They repeatedly asked Ivan where Trooper Morrow was taking "Mommy" and what he was going to do to her.

56. While Trooper Morrow detained Paige in the back of the patrol vehicle, Trooper Morrow began to question Paige about her husband's immigration status.

57. Trooper Morrow told Paige he was going to contact Border Patrol to initiate a possible immigration apprehension.

58. Trooper Morrow contacted Border Patrol at approximately 12:04 pm.

59. After contacting Border Patrol, Trooper Morrow continued to question Paige about her husband's immigration status and history in the United States.

60. While detaining Paige in the patrol vehicle, Trooper Morrow asked Paige four times if her husband, Ivan, was here "illegally."

61. Trooper Morrow questioned Paige about how Ivan came to the United States—specifically, if he entered with a "coyote" and if he entered with his brother.

62. Trooper Morrow repeatedly questioned Paige about Fernando's immigration status, his method of entering the United States, and his pending removal proceedings at the Cleveland Immigration Court.

11

63. In an effort to enforce civil immigration law, Trooper Morrow detained Paige, Ivan, Fernando, D.D., R.D., and D.M. for approximately forty minutes. Border Patrol agents arrived at approximately 12:20 p.m.

64. Once Border Patrol agents arrived, at approximately 12:22 p.m., Trooper Morrow informed Paige she was still not free to leave the patrol vehicle.

65. At approximately 12:25 p.m., Paige asked if she could be released from Trooper Morrow's patrol vehicle to give her husband a hug since she did not know when she would see him again. Trooper Morrow did not permit Paige to leave the vehicle.

66. At no time during this detention did Paige, Ivan, Fernando, D.D., R.D., or D.M. feel free to leave the respective vehicles where they were held.

67. Trooper Morrow accompanied the Border Patrol agents as they questioned Ivan, searched him, and ordered him into the Border Patrol vehicle.

68. Once Ivan was in the Border Patrol vehicle, Trooper Morrow returned to his OSHP vehicle and allowed Paige to get out of the vehicle and return to her car. Trooper Morrow told Paige "if I were you, I'd probably go back home rather than going to court." Trooper Morrow left the scene, and Paige also drove her car away from the scene, continuing towards Cleveland.

69. Paige drove Fernando and the three children to Cleveland. Fernando arrived at his Immigration Court hearing just as the hearing started.

70. Trooper Morrow issued Paige a written warning for following too closely to the vehicle in front of her.

71. Following too closely is an offense for which an officer may only issue a citation, and not arrest an offender or their passengers, unless enumerated exceptions apply, none of which applied here.

72. Paige had not been following too closely to the vehicle in front of her when Trooper Morrow stopped the vehicle.

73. Paige was driving with due regard for traffic and road conditions. She was not traveling above the speed limit. There was not heavy traffic on the road. The visibility was clear despite the light precipitation and there were no other adverse weather conditions.

74. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, Paige Monzalvo Lazcano.

75. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, Ivan Monzalvo Lazcano.

76. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, D.D.

77. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, R.D.

78. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, D.M.

79. Trooper Morrow never issued a citation to, nor pursued any criminal charges against, Fernando Monzalvo Lazcano.

80. The Border Patrol Agents arrived in the Border Patrol vehicle, speaking very briefly with Ivan and questioning him about his immigration status. Ivan asked the Border Patrol

agents what would happen to his family. The agents responded that they did not know, because Ohio State Highway Patrol was responsible for his family.

81. Border Patrol agents drove Ivan to the Sandusky Bay Border Patrol Station in Port Clinton, Ohio, where he was booked, interviewed, and fingerprinted.

82. Ivan was transported to Seneca County Jail and transferred to ICE custody. He was placed in removal proceedings in the Cleveland Immigration Court.

### E. After the arrest

83. While Ivan was detained at the Seneca County Jail, the Immigration Judge ordered him released on a $10,000 bond on November 20, 2017. Paige posted Ivan's bond and Ivan was released on November 21, 2017.

84. Ivan was detained for approximately twenty days.

85. This unlawful detention was the direct result of Trooper Morrow's seizure and detention of Ivan on November 1, 2017.

86. Ivan suffered emotional trauma and distress while detained—both in the initial traffic stop and in the prolonged stop that ensued—by Trooper Morrow without any legal or factual basis.

87. Ivan suffered emotional trauma and distress and economic deprivation while he was detained at the Seneca County Jail as a direct result of Trooper Morrow's detention.

88. Ivan suffered emotional trauma and distress and economic deprivation when he was placed in removal proceedings and subjected to the possibility of removal from the United States because of his apprehension by Trooper Morrow. Because Ivan is now in removal proceedings, he is ineligible for certain types of immigration benefits that he would otherwise have been able to pursue based on his marriage to Paige.

89. Paige suffered severe emotional trauma and distress, resulting in physical symptoms, when she was detained by Trooper Morrow in the vehicle she had been driving and again in Trooper Morrow's patrol vehicle. She was further traumatized when she was repeatedly questioned about her husband's immigration status, forced to watch his apprehension by Border Patrol, and denied multiple opportunities to leave Trooper Morrow's patrol car to say goodbye to her husband and comfort her crying children.

90. D.D., R.D., and D.M. suffered emotional trauma and distress when they were detained by Trooper Morrow, held without their mother, and forced to watch their stepfather's (D.D. and R.D.) and father's (D.M.) immigration apprehension. Their detention was the direct result of Trooper Morrow's racially motivated stop and prolonged detention of the Monzalvo family.

91. Fernando suffered emotional trauma and distress when he was detained by Trooper Morrow and nearly missed his Immigration Court hearing due to the prolonged detention. The consequence of a failure to appear in Immigration Court is an order of removal *in absentia*.

92. Paige, D.D., R.D., and D.M. suffered emotional trauma and distress and economic deprivation because of Ivan's detention at Seneca County Jail and separation from the family, his placement in removal proceedings, and the threat of his removal from the United States, all of which were a direct result of Ivan's unlawful detention by Trooper Morrow.

93. Ivan, Fernando, D.D., R.D., and D.M. were embarrassed and humiliated by their detention on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

94. Paige was embarrassed and humiliated by her detention on the basis of her family members' race, ethnicity and/or perceived national origin.

95. Trooper Morrow intentionally violated federal law when he seized the six aforementioned Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

96. Trooper Morrow showed reckless and callous disregard for Plaintiffs' constitutional rights when he seized the six aforementioned Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

## V. CAUSES OF ACTION

**COUNT I (BY PLAINTIFFS IVAN MONZALVO LAZCANO, PAIGE MONZALVO LAZCANO, D.D., R.D., D.M., AND FERNANDO MONZALVO LAZCANO) – UNREASONABLE SEIZURE: FOURTH AMENDMENT, AS INCORPORATED BY FOURTEENTH AMENDMENT, TO THE UNITED STATES CONSTITUTION (AGAINST DEFENDANT MORROW IN HIS INDIVIDUAL CAPACITY)**

97. Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

98. Trooper Morrow seized Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin and without probable cause or reasonable suspicion that they had committed a crime.

99. In so doing, Trooper Morrow violated Plaintiffs' Fourth Amendment rights, as incorporated by the Fourteenth Amendment, to be free from unlawful seizure.

100. Trooper Morrow intentionally violated federal law by stopping Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

16

101. Trooper Morrow intentionally violated federal law by prolonging the stop of Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

102. Trooper Morrow acted with reckless disregard and callous indifference toward Plaintiffs' constitutional rights.

103. Trooper Morrow acted toward Plaintiffs with malicious intent because he intentionally deprived them of the right to be free of racial, ethnic, and national-origin discrimination.

104. As a result of Trooper Morrow's unlawful conduct, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

**COUNT II (BY PLAINTIFFS IVAN MONZALVO LAZCANO, PAIGE MONZALVO LAZCANO, D.D., R.D., D.M., AND FERNANDO MONZALVO LAZCANO) – VIOLATION OF THE EQUAL PROTECTION CLAUSE: FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (AGAINST DEFENDANT MORROW IN HIS INDIVIDUAL CAPACITY)**

105. Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

106. Trooper Morrow stopped, seized, and detained Plaintiffs knowingly and intentionally, and motivated by animus against Plaintiffs Ivan Monzalvo Lazcano and Fernando Monzalvo Lazcano's race, ethnicity, and/or perceived national origin in violation of the Equal Protection Clause of the Fourteenth Amendment.

107. Trooper Morrow deprived Plaintiffs of basic due process protections by targeting them for their and/or their family members' race, ethnicity, and/or perceived national origin in violation of their right to equal protection under the Fourteenth Amendment.

108. Trooper Morrow intentionally violated federal law by stopping Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

109. Trooper Morrow intentionally violated federal law by prolonging the stop of Plaintiffs on the basis of their and/or their family members' race, ethnicity, and/or perceived national origin.

110. Trooper Morrow acted with reckless disregard and callous indifference toward Plaintiffs' constitutional rights.

111. Trooper Morrow acted toward Plaintiffs with malicious intent because his actions were based on racial, ethnic, and national-origin animus.

112. As a result of Trooper Morrow's actions, Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A. Enter a declaratory judgment that Defendant Morrow violated Plaintiffs Ivan Monzalvo Lazcano, Paige Monzalvo Lazcano, Fernando Monzalvo Lazcano, D.D., R.D., and D.M.'s Fourteenth Amendment right to be free from unreasonable search and seizure;

B. Enter a declaratory judgment that Defendant Morrow violated Plaintiffs Ivan Monzalvo Lazcano, Paige Monzalvo Lazcano, Fernando Monzalvo Lazcano,

D.D., R.D., and D.M.'s Fourteenth Amendment right to Equal Protection of the laws;

C. Actual and compensatory damages sufficient to make Plaintiffs whole;

D. Punitive damages against Defendant sufficient to punish them and to deter further wrongdoing;

E. Reasonable attorneys' fees, costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

H. Any other relief the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial on the claims triable as of right by jury set forth herein.

Respectfully submitted,

By: /s/ Kathleen C. Kersh
Kathleen C. Kersh (0091198)
/s/ Emily Brown
Emily Brown (0092553)
/s/ Mark R. Heller
Mark R. Heller (0027027)
/s/ Eugenio Mollo Jr.
Eugenio Mollo, Jr. (0081860)
Advocates for Basic Legal Equality, Inc.
130 West 2nd Street, Suite 700 East
Dayton, OH 45402
937.535.4408 (phone)
937.535.4600 (fax)
kkersh@ablelaw.org
ebrown@ablelaw.org
mheller@ablelaw.org
emollo@ablelaw.org