IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IVAN MONZALVO LAZCANO, et al.,          CASE NO. 1:18-CV-02784

                          Plaintiffs,

          -vs-                                    JUDGE PAMELA A. BARKER

TROOPER SHANE M. MORROW,
                                                  MEMORANDUM   OF   OPINION   AND
                          Defendant.              ORDER

        This matter comes before the Court upon the Motion for Summary Judgment of Defendant

Trooper Shane M. Morrow ("Morrow").  (Doc. No. 27.)  Plaintiffs Ivan Monzalvo Lazcano ("Ivan"),

Fernando  Monzalvo  Lazcano  ("Fernando"),  Paige  Monzalvo  Lazcano  ("Paige"),  D.B.M.L.,

R.G.M.L., and D.M.M.L. (collectively, "Plaintiffs") filed a brief in opposition on February 14, 2020,

to which Morrow replied on March 2, 2020.  (Doc. Nos. 30, 31, 32.)[1]  For the following reasons,

Morrow's Motion for Summary Judgment (Doc. No. 27) is GRANTED.

I.      **Background**

        a.  **Factual Background**

        On November 1, 2017, Plaintiffs were all traveling together in a vehicle driving northbound

on Interstate 71 towards Cleveland, Ohio in order to attend a hearing at the Cleveland Immigration

Court for Fernando.  (Doc. No. 27-3 at 40:14-41:13; Doc. No. 27-4 at 10:14-19.)  Specifically, the

vehicle's occupants included (1) Paige; (2) her husband, Ivan; (3) their daughter, D.M.M.L.; (4)

---

[1] Plaintiffs filed two briefs in opposition that are identical, except for two corrections to citations made in the second
filing.  (*See* Doc. Nos. 30, 31.)  The Court will only refer to the second version submitted by Plaintiffs throughout the rest
of the opinion.

Paige's daughters, D.B.M.L. and R.G.M.L.; and (5) Ivan's brother, Fernando.  Paige is Caucasian, and all other Plaintiffs are Hispanic/Latino.  (Doc. No. 31 at 1.)

On that day, Morrow, who was then a member of the Ohio State Highway Patrol's Criminal Patrol Unit focused on drug interdiction, observed Plaintiffs' vehicle drive by him while he was in his vehicle parked at a crossover on Interstate 71.  (Doc. No. 27-1 at 48:19-49:10, 108:20-109:15.) Morrow noticed Plaintiffs' vehicle was going below the speed limit in the middle lane of the interstate and pulled out to follow it.  (*Id.* at 109:16-25, 113:18-114:2; Doc. No. 27-2 at 57:12-24.)  While following Plaintiffs, Morrow observed what he perceived as nervousness based on the way that Ivan—who was driving at the time—was holding the wheel, the vehicle's consistent pace in the middle lane, the fact that the vehicle was traveling below the speed limit (although it was raining), and the fact that the occupants never looked directly at him.  (Doc. No. 27-1 at 110:10-19, 113:20-114:2, 149:9-25; Doc. No. 27-2 at 57:20-24.)

Three to four minutes after Morrow started following them, Plaintiffs exited the interstate. (Doc. No. 27-2 at 59:23-60:8.)  According to Morrow, Plaintiffs' vehicle moved from the middle lane to the exit lane in one quick movement, and he could not safely follow them.  (Doc. No. 27-1 at 110:25-111:15.)  As a result, Morrow claims that he went to the next crossover and waited for Plaintiffs' vehicle to return to the interstate.  (*Id.* at 111:16-18.)  In contrast, Plaintiffs assert that they properly moved to the right lane for a period of time and then exited the interstate, and that Morrow also exited the interstate after them.  (Doc. No. 27-3 at 50:8-21, 57:17-58:2.)  Plaintiffs contend that Morrow continued to follow Plaintiffs until they turned into a McDonald's parking lot, at which point

Morrow continued straight down the road.  (*Id.* at 50:22-51:18.)[2]  Paige and the children then went inside the McDonald's to use the restroom.  (*Id.* at 53:3-10.)  When they returned to the car, Paige began driving and got back on the interstate.  (*Id.* at 53:14-20.)

Despite this conflicting testimony, the parties agree that by the time Plaintiffs returned to Interstate 71, Morrow was parked and waiting in another crossover.  (Doc. No. 29-2 at 11:54:26.)[3] When Plaintiffs' vehicle passed Morrow, he again pulled out of the crossover and accelerated to catch up to it, although he was unsure if it was the same vehicle because he noticed it was now being driven by a woman.  (*Id.* at 11:54:40-11:55:45; Doc No. 27-1 at 117:1-11.)  Morrow subsequently observed Plaintiffs' vehicle traveling sixty to sixty-five miles per hour and staying between one and two car lengths from the camper in front of it.  (Doc. No. 29-2 at 11:56:08-26; Doc. No. 27-2 at 104:24-105:10; Doc. No. 27-3 at 61:15-62:11.)  He then pulled Plaintiffs' vehicle over onto the right shoulder of the highway.  (Doc. No. 29-2 at 11:57:28-45.)

Once stopped, Morrow approached Plaintiffs' vehicle from the passenger side, and asked for the driver's license, the vehicle's registration, and proof of insurance, and told them that he stopped them for following too closely behind another vehicle.  (*Id.* at 11:57:54-11:58:12.)  Morrow then asked who owned the vehicle, and Paige responded that it was her husband's vehicle.  (*Id.* at 11:58:17-18; Doc. No. 27-3 at 67:8-13.)  Subsequently, Morrow asked whether Ivan was Paige's husband and whether he had been driving earlier, and Ivan responded that he had been driving earlier.  (Doc. No.

---

[2] Ultimately, the parties' disagreement regarding whether Plaintiffs' vehicle properly changed lanes and whether Morrow followed them off the interstate is not relevant to Plaintiffs' claims and, therefore, does not create a dispute of material fact that would preclude summary judgment.  *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).

[3] A video recording from Morrow's dashcam begins when he is parked at this crossover and continues through the rest of the stop.  (*See* Doc. No. 29-2.)

3

29-2 at 11:58:20-27; Doc. No. 27-2 at 83:10-84:10.) Morrow then asked for Ivan's identification, and Ivan provided his Mexican consular identification card. (Doc. No. 29-2 at 11:58:30-34; Doc. No. 27-2 at 84:13-85:11; Doc. No. 31-1.) Next, Morrow inquired as to whether the reason that Plaintiffs stopped at McDonald's earlier and switched drivers was because Ivan did not have a license. (Doc. No. 29-2 at 11:58:42-52.) Ivan responded that the main reason for the stop was for Paige and his daughters to use the restroom, but that the stop was also because he did not have a driver's license and had been driving the vehicle. (Doc. No. 27-2 at 85:14-88:2.)

Morrow then asked where Plaintiffs were heading, and Ivan and Paige stated that they were going to Cleveland. (*Id.* at 88:3-9; Doc. No. 27-3 at 71:23-72:3.) Neither Ivan nor Page mentioned anything about the reason for their trip to Cleveland, but Morrow followed up by asking whether they were heading to court or had an immigration hearing. (Doc. No. 29-2 at 11:58:56-11:59:00; Doc. No. 27-2 at 88:10-12; Doc. No. 27-3 at 72:5-15.) Morrow went on to question Plaintiffs to clarify who had the immigration hearing and whose children were in the car. (Doc. No. 29-2 at 11:59:00-12:00:33.) He also requested Fernando's identification and immigration court documents, and Fernando provided the documents he had with him, as well as an identification card from his immigration attorney. (*Id.*; Doc. No. 27-4 at 19:12-20:24.) All of the questioning up to this point occurred within approximately three minutes of Morrow stopping Plaintiffs' vehicle.

Subsequently, Morrow asked Paige to exit the car and come back with him to his vehicle. (Doc. No. 29-2 at 12:00:32-35.) After Paige exited Plaintiffs' vehicle and walked towards Morrow's vehicle, Morrow reiterated to her that the reason for the traffic stop was that Paige was traveling too closely behind another vehicle, explaining that she had been driving within one to two car lengths behind another vehicle while traveling at sixty to sixty-five miles per hour. (*Id.* at 12:00:50-

12:01:23.)  They also continued to discuss Plaintiff's trip to Cleveland and what time Plaintiffs were supposed to arrive.  (*Id.* at 12:01:23-35.)  Paige then agreed to a pat-down search by Morrow.  After conducting a quick pat down, Morrow directed Paige to sit in the back of his patrol vehicle next to his drug-sniffing dog while he ran her information.  (*Id.* at 12:01:35-55.)  Standing outside the door of his vehicle where Paige was seated in the back, he also had Paige clarify that Ivan was Paige's husband and that Ivan's brother, Fernando, had the immigration hearing.  He then inquired whether Ivan was "in some type of" immigration process, to which Paige replied that they were trying to "set it up right now."  (*Id.* at 12:01:55-12:02:16.)  Morrow then walked around to enter his vehicle as well, at which time Paige asked Morrow to "not to do anything to him."  (*Id.* at 12:02:28-37.)  When Morrow asked what she meant by that, Paige said, "immigration or anything like that."  (*Id.* at 12:02:47-51.)  Morrow replied that Ivan's "immigration status is out of my concern," but "the United States Border Patrol is down here working with us right now" and he was going to call Border Patrol to come to the scene to "check [Ivan's immigration status.]"  (*Id.* at 12:02:57-12:03:15.)  Shortly thereafter, Morrow requested assistance from the United States Border Patrol.  (*Id.* at 12:04:40-12:05:26; Doc. No. 27-3 at 92:24-93:11.)  A total of approximately seven minutes had passed since Morrow had stopped Plaintiffs at that time.

At his deposition, Morrow testified that he called the Border Patrol because he had no way to confirm Ivan's identity without a driver's license or state identification, and Border Patrol would be able to verify Ivan's identify, in addition to Fernando's identity and the immigration court documents. (Doc. No. 27-1 at 57:7-59:4, 129:22-130:3, 131:21-132:2, 182:19-25.)  Specifically, Morrow testified that "the Border Patrol was called to come and identify him.  And then also if, if they want to take him for the immigration violation, that was up to them."  (*Id.* at 129:24-130:3.)  However, at no point

during the course of the stop—before or after the Border Patrol agents arrived—did Morrow ask the Border Patrol agents to run an identification or criminal history check on Ivan or Fernando.

As they waited for Border Patrol to arrive, Morrow continued to discuss a variety of topics with Paige, such as his observations of Plaintiffs before pulling them over, whether Ivan had a driver's license, the results of his computer check on the registration of Plaintiffs' vehicle, Fernando's documents and the circumstances surrounding his entry into the United States, whether Ivan was legally present in the United States, and the fact that Morrow intended to issue Paige a warning for following too closely behind another vehicle.  (Doc. No. 29-2 at 12:05:27-12:20:50.)

Approximately sixteen minutes after Morrow called for assistance—twenty-three minutes into the stop in total—the Border Patrol agents arrived.  (*Id.* at 12:20:50.)  Morrow gave the agents a summary of his encounter with Plaintiffs and the information he had gathered on Ivan's and Fernando's immigration status.  (*Id.* at 12:21:00-12:22:01.)  The agents then went to Plaintiffs' vehicle to speak to Ivan and Fernando. (*Id.* at 12:22:02.)  At that time, Morrow returned to his vehicle, returned Paige's identification, and gave her a written warning for following too closely behind another vehicle.  (*Id.* at 12:22:12-20; Doc. No. 27-1 at 192:1-25.)  He then asked her to remain in the vehicle.  (Doc. No. 29-2 at 12:22:22-27.)  A couple of minutes later, the Border Patrol agents informed Paige that they were taking Ivan into custody.  (*Id.* at 12:25:25-40.)

Approximately sixteen minutes after the Border Patrol agents arrived—thirty-nine minutes into the stop in total—a Border Patrol agent returned to Morrow's vehicle to inform Paige where Ivan was being taken, and Paige was released from the back of Morrow's vehicle to talk to Ivan before he was taken away.  (*Id.* at 12:36:04-42.)  Shortly after Paige exits Morrow's vehicle, the sound of the video from Morrow's dashcam cuts out for the remainder of the recording.  (*Id.* at 12:37:55.)

6

However, at her deposition, Paige testified that as she was returning to her vehicle to drive away, Morrow rolled down his passenger window and spoke to Paige.  (Doc. No. 27-3 at 131:13-132:3.) According to Paige, she asked Morrow how he would feel if he were in her position, and Morrow responded that he was not the one married to an illegal alien.  (*Id.* at 132:5-8.)  Paige then returned to her vehicle.  (Doc. No. 29-2 at 12:39:10-22.)

### b.  Procedural History

On December 3, 2018, Plaintiffs filed a Complaint against Morrow, setting forth two counts under 42 U.S.C. § 1983 for Morrow's alleged violations of their constitutional rights.  (Doc. No. 1.) Specifically, Plaintiffs claim that Morrow (1) violated the Fourth Amendment, as incorporated by the Fourteen Amendment, by seizing them without probable cause or reasonable suspicion that a crime had been committed and unreasonably prolonging the seizure; and (2) violated the Fourteenth Amendment's Equal Protection Clause by stopping Plaintiffs and prolonging the stop based on Plaintiffs' race, ethnicity, and perceived national origin.  (*Id.* at ¶¶ 97-112.)

On January 15, 2020, Morrow filed a Motion for Summary Judgment, asserting Plaintiffs' claims should be dismissed because he is entitled to qualified immunity.  (Doc. No. 27.)  Plaintiffs filed a brief in opposition to Morrow's Motion for Summary Judgment on February 14, 2020, to which Morrow replied on March 2, 2020.  (Doc. Nos. 31, 32.)

## II.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir.

2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)).

"[T]he moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a

8

conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### III.  Analysis

"Police officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether an officer is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "Once a defendant invokes qualified immunity, the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013).

With regard to the second prong of the analysis, whether the right violated was clearly established, the Sixth Circuit has elaborated that "[t]he constitutional right cannot simply be a general prohibition, but rather 'the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  However, that "is not to say that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Katz*, 533 U.S. at 202. Additionally, "[i]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)).

### a. Count I

In Count I of their Complaint, Plaintiffs allege that Morrow stopped Plaintiffs without probable cause or reasonable suspicion that they had committed a crime and unreasonably prolonged their seizure. (Doc. No. 1 at ¶¶ 97-104.) Morrow contends he is entitled to summary judgment on Count I because he had probable cause to initiate the stop of Plaintiffs for following too closely behind another vehicle and reasonable suspicion of additional criminal activity justifying the extension of the stop. (Doc. No. 27 at 10-17.) In particular, Morrow argues that Plaintiffs' prolonged detention was justified by reasonable suspicion that Ivan had been driving without a license, that Paige wrongfully entrusted her vehicle to an unlicensed driver, and that Ivan and Fernando had entered the United States improperly in violation of federal immigration law. (*Id.* at 12-17.) In response, Plaintiffs appear to concede that Morrow had probable cause to pull them over, but contend that their extended seizure was unreasonable for a number of reasons. (Doc. No. 31 at 9-16.) Plaintiffs assert Morrow did not have reasonable suspicion of wrongful entrustment or illegal entry and that Morrow had no authority to enforce the federal statute prohibiting illegal entry. (*Id.* at 12-16.) They also

10

claim that although Morrow became aware that Ivan did not have a license shortly after stopping them, Morrow took no action to actually investigate Ivan's driving without a license that would justify the extended length of the stop.  (*Id.* at 13-14.)  Upon review of the parties' arguments, the Court finds that Morrow is entitled to summary judgment on Plaintiffs' claims that Morrow's actions violated their rights under the Fourth Amendment.

As noted briefly above, Plaintiffs do not dispute that the initial stop of Plaintiffs' vehicle was lawful.  Nor could they, as Morrow had probable cause to believe that Paige had committed a traffic violation.  Stopping and detaining a driver constitutes a seizure within the meaning of the Fourth Amendment of both the driver and any accompanying passengers.  *See Brendlin v. California*, 551 U.S. 249, 251 (2007).  But "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment."  *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (quoting *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996)).  "The requirements of probable cause are satisfied 'where "the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'"  *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

Here, before pulling Plaintiffs' vehicle over, Morrow observed the vehicle traveling sixty to sixty-five miles per hour and staying one to two car lengths behind another vehicle.  (Doc. No. 29-2 at 11:56:08-26; Doc. No. 27-2 at 104:24-105:10; Doc. No. 27-3 at 61:15-62:11.)  Consequently, he had probable cause to believe that the driver of Plaintiffs' vehicle had violated Ohio Revised Code § 4511.34(A), which provides that "[t]he operator of a motor vehicle . . . shall not follow another vehicle

11

. . . more closely than is reasonable and prudent, having due regard for the speed of such vehicle . . . and the traffic upon and the condition of the highway."  Ohio Rev. Code § 4511.34(A); *see United States v. Williamson*, No. 3:11CR155, 2011 WL 4944400, at *3 n.3 (N.D. Ohio Oct. 17, 2011) ("Ohio courts have consistently upheld the one car length/ten mph rule of thumb as applied to justify stops for violation [of] O.R.C. § 4511.34(A).").  As a result, Morrow's initial stop of Plaintiffs' vehicle was constitutionally permissible.

However, this does not end the Court's inquiry, as "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  An ordinary traffic stop "is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), apply to define the scope of reasonable police conduct."  *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).  Accordingly, the Court must determine whether Morrow's execution of the traffic stop complied with the standard for temporary detentions set forth in *Terry* and its progeny.

"To qualify as reasonable seizures under the Fourth Amendment, *Terry* detentions must be 'limited in [both] scope and duration.'"  *Everett*, 601 F.3d at 488 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  That is, "a stop 'must . . . last no longer than is necessary to effectuate the purpose of the stop'" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.* (quoting *Royer*, 460 U.S. at 500).  However, some amount of unrelated questioning is permissible "so long as the officer's

overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop."  *Id.* at 495.

Additionally, police may extend a stop beyond the scope of what was originally permissible if "something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."  *Hill*, 195 F.3d at 264; *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) ("To detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct.") (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)).  "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop."  *Bell*, 555 F.3d at 540 (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)).  In other words, "[r]easonable suspicion is more than an ill-defined hunch" and "must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity."  *Id.* (quoting *Smith*, 263 F.3d at 588).

First, the Court finds that Morrow did not impermissibly extend Plaintiffs' detention by his initial questioning during the first seven minutes of the stop prior to calling for Border Patrol's assistance.  In the traffic stop context, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'"  *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Caballes*, 543 U.S. at 408).  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.*  In addition, "initial questions related to the driver's and passenger's identities and their purpose for traveling are not

13

beyond the permissible scope." *United States v. $275,000 in U.S. Currency*, No. 1:07-0058, 2009 WL 1588661, at *11 (M.D. Tenn. June 5, 2009); *United States v. Potts*, No. 97-6000, 1999 WL 96756, at *4 (6th Cir. Feb. 2, 1999) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop.").

In the instant matter, during the first seven minutes of the stop, almost all of Morrow's questions fell within the permissible scope of inquiries for a stop based on Paige's traffic violation. After pulling Plaintiffs' vehicle over, Morrow immediately asked for Paige's license, the vehicle's registration, and proof of insurance, and informed Plaintiffs that he stopped them for following too closely behind another vehicle. (Doc. No. 29-2 at 11:57:54-11:58:12.) He then questioned Plaintiffs about Ivan driving earlier and their stop at McDonald's, obtained identification from Ivan and Fernando, inquired as to the other minor passengers, and asked about Plaintiffs' purpose for traveling to Cleveland. (*Id.* at 11:58:17-12:00:33.) When Morrow asked Paige to step out of the vehicle, he continued to discuss the reason for the stop, asked for more information about what time Plaintiffs needed to arrive in Cleveland, and clarified who had the immigration hearing and the Plaintiffs' relationships to one another. (*Id.* at 12:00:33-12:02:16.) This occurred as Paige and Morrow moved towards and entered Morrow's vehicle so that he could run Paige's information. (*Id.*) None of this questioning exceeded the scope of the traffic stop or impermissibly extended Plaintiffs' detention.

Even assuming, *arguendo*, that, as Plaintiffs' claim, any questioning as to Plaintiffs' immigration status exceeded the scope of the stop, Morrow asked only a single question during the first seven minutes of the stop directly regarding immigration status. Specifically, Morrow asked Paige whether Ivan was "in some type of" immigration process. (*Id.* at 12:01:55-12:02:16.) When

14

Paige answered and then followed up on her own to request that Morrow not take any action related to Ivan's immigration status, Morrow refrained from asking additional immigration related questions, noting that it was out of his concern.  (*Id.* at 12:01:55-12:03:15.)  He then called for Border Patrol's assistance.  (*Id.* at 12:04:40-12:05:26.)  This limited interaction regarding Ivan's immigration status did not impermissibly extend Morrow's initial questioning or demonstrate that Morrow had "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation."  *Everett*, 601 F.3d at 495.  While Morrow did ask several questions related to Fernando's immigration hearing, such questions were permissible as pertaining to Plaintiffs' travel plans and purposes for traveling.

Next, the Court finds that Morrow did not violate clearly established law by calling Border Patrol and waiting sixteen minutes for Border Patrol agents to arrive.  Another court from this district recently addressed a scenario similar to the one presented here.  In *Gomez Alvarado v. Beard*, three individuals did not produce sufficient identification after an officer found two of them fishing without a license.  No. 3:18 CV 589, 2020 WL 516284, at *1 (N.D. Ohio Jan. 8, 2020).  In response, the officer asked whether they were illegally present in the United States, and, after they responded that they were, the officer allegedly "smiled and said, 'I'm going to send you back to Mexico.'"  *Id.*  The officer then called Border Patrol and detained all three individuals and their five respective children for almost an hour and a half until Border Patrol agents arrived and transported them to a Border Patrol station.  *Id.*  A second state officer that had arrived during the wait for the Border Patrol agents wrote one of the detained individuals an unlicensed fishing citation and gave it to one of the Border Patrol agents before they left.  *Id.*

15

In defense of the extended detention, the officers argued that holding the individuals until Border Patrol arrived was necessary to verify their identity in order to issue a citation.  *Id.* at *3.  The court granted summary judgment in favor of the officers with respect to the detained individuals' prolonged detention claims, reasoning:

> This Court doubts that law-enforcement officers may detain someone for ninety minutes to verify identity and address, at least when the detainee has committed only a low-level regulatory crime.  However, perhaps due to the unusual facts of this case, on-point authority is apparently nonexistent.  Absent such precedent, qualified immunity shields Beard and Kaufmann from liability.

> Of course, Beard's true motivation may not have been a desire to enforce Ohio's fishing regulations.  Rather, he may have hoped to facilitate the deportation of the adult Plaintiffs, who admitted to unlawful immigration status.  But Beard's intent is irrelevant.  "[T]he Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent."  *Whren v. United States*, 517 U.S. 806, 814 (1996) (citation, emphasis, and internal quotation marks omitted); *accord Wiley v. Oberlin Police Dept.*, 330 F. App'x 524, 528 (6th Cir. 2009).

*Id.* at *3-4.

Here, after pulling Plaintiffs' vehicle over, Morrow developed reasonable suspicion that Ivan had been driving without a license in violation of Ohio Revised Code § 4510.12(A)(1).  To wit, within minutes of the stop, Ivan admitted that he had been driving when Morrow first saw Plaintiffs' vehicle and that he did not have a license.  (Doc. No. 27-2 at 83:10-84:10, 85:14-88:2.)  Plaintiffs argue that Morrow had the necessary information to issue a citation well before the Border Patrol agents arrived, yet took no further steps to investigate Ivan's violation.  (Doc. No. 31 at 13.)  However, Morrow testified that he would not be able to identify Ivan through his computer system without a driver's license or state identification—which Plaintiffs have not challenged—and that he called Border Patrol because they would be able to verify Ivan's identity.  (Doc. No. 27-1 at 57:7-59:4, 129:22-130:3, 131:21-132:2, 182:19-25.)  Morrow's intent in calling Border Patrol may not have been to verify

16

Ivan's identity for the purpose of issuing a citation—indeed, Morrow never asked the Border Patrol agents to run an identification check and never issued a citation to Ivan—but that is not relevant under the Fourth Amendment's objective reasonableness standard. *See, e.g.*, *United States v. Torres-Ramos*, 536 F.3d 542, 550 n.7 (6th Cir. 2008) ("The subjective intent of the officer is irrelevant, both before and after the initial stop."). Consequently, as in *Gomez Beard*, without authority demonstrating that holding Plaintiffs for an additional sixteen minutes to verify Ivan's identity was unreasonable, qualified immunity protects Morrow from liability for this additional extension of the stop. In fact, that conclusion is even more strongly supported here, as Morrow held Plaintiffs for significantly less time than the individuals were held in *Gomez Beard*.[4]

Finally, although neither party specifically addressed the reasonableness of detaining Paige and the other Plaintiffs another sixteen minutes following the arrival of Border Patrol, the Court finds that Morrow's actions in this regard also did not violate clearly established law. Shortly after their arrival, the Border Patrol agents informed Paige that they were going to take Ivan into custody, and Morrow's decision to continue to detain Paige in the back of his vehicle while Ivan's arrest took place did not violate clearly established law. *See United States v. Harvey*, No. 5:17-CR-86-DCR-REW, 2017 WL 4018478, at *4 (E.D. Ky. Sept. 11, 2017) ("[W]here an individual is in an area immediately adjoining the arrestee, the individual may be placed in temporary protective detention even in the

---

[4] The Court also notes that based on this finding, the subject matter of the questions that Morrow asked Paige while waiting for the Border Patrol agents to arrive is irrelevant. Because Morrow was waiting for the Border Patrol agents to arrive, even if his questions were unrelated to the purposes of the stop, they did not act to prolong the stop further. *See Bell*, 555 F.3d at 542 ("Because the Officers already were waiting for the results of the background check, any time that the Officers spent in pursuing other matters while the background check was processing, even if those matters were unrelated to the original purpose of the stop, did not extend the length of the stop.").

absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety.") (quoting *United States v. Kinzalow*, 236 F. App'x 414, 418 (10th Cir. 2007)).

Consequently, the Court finds that Morrow is entitled to summary judgment on Plaintiffs' claims under the Fourth Amendment based on their initial seizure and the length of their detention.[5]

### b.  Count II

Plaintiffs also assert that Morrow violated Plaintiffs' rights under the Equal Protection Clause by stopping Plaintiffs and prolonging their detention based on their perceived race and national origin. (Doc. No. 31 at 16.)  Morrow contends that Plaintiffs' selective enforcement claims fail because they have not presented evidence that other similarly situated drivers were not pulled over and because they cannot demonstrate that Morrow's actions had a discriminatory purpose or effect.  (Doc. No. 27 at 17-19; Doc. No. 32 at 10-18.)  Conversely, Plaintiffs argue that Morrow's deposition testimony and actions during the stop sufficiently support their claims.  (Doc. No. 31 at 16-20.)  The Court concludes that summary judgment in favor of Morrow on Plaintiffs' selective enforcement claims is appropriate.

"The Equal Protection Clause prohibits the selective enforcement of laws based on arbitrary classifications."  *Conrad v. City of Berea*, 243 F. Supp. 3d 896, 902 (N.D. Ohio 2017).  To prevail on a claim of selective enforcement in violation of the Equal Protection Clause, a plaintiff must satisfy three elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations.  Second, [the official] must initiate the prosecution with a

---

[5] Based on the analysis above, the Court finds it unnecessary to address the parties' arguments regarding wrongful entrustment and federal immigration law.

discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)). This "standard is a demanding one." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)). Indeed, "there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary." *Id.*

The Court agrees with Morrow that Plaintiffs' claims cannot succeed with regard to the initial stop of Plaintiffs' vehicle, as Plaintiffs have not provided any evidence of similarly situated people that were treated differently. The Sixth Circuit has made clear "that as to the first element 'it is an absolute requirement that the plaintiff make at least a *prima facie* showing that similarly situated persons outside [his] category were not prosecuted." *Cunningham v. Sisk*, 136 F. App'x 771, 775 (6th Cir. 2005) (quoting *Gardenhire*, 205 F.3d at 319). For example, in *Cunningham*, an officer pulled over the plaintiff, held him at gun point, waited for other officers to arrive, searched his car and found nothing illegal, ran a check on his license and registration that yielded no negative information, and then issued him a citation for speeding. *Id.* at 772-73. On appeal, the Sixth Circuit affirmed the dismissal of the plaintiff's selective enforcement claim on summary judgment because he relied entirely on the fact that he was African American and two of the officers involved were white, finding that the plaintiff "proffered nothing to suggest that similarly situated people (speeders) of different races were treated differently in terms of arrest or search or the issuance of traffic citations." *Id.* at 775; *see also Pullin v. City of Canton*, 133 F. Supp. 2d 1045, 1054 (N.D. Ohio 2001) (granting summary judgment in favor of the defendant because the plaintiff did "not offer evidence

19

satisfying the 'absolute requirement' of any selective enforcement claim—a showing 'that similarly situated persons outside her category were not prosecuted'") (citation omitted).

Similarly, in this case, Plaintiffs have not provided any evidence that Morrow did not stop similarly situated people of different races or national origin. In fact, Paige and Ivan admitted that no other cars were following as closely behind other vehicles as they were when Morrow pulled Plaintiffs' over. (Doc. No. 27-2 at 105:11-106:17; Doc. No. 27-3 at 63:13-20.) Instead, in support of their claims, Plaintiffs appear to rely on the fact that Morrow became suspicious and started to follow them only after observing Ivan driving and, thereby, noticing his Hispanic ethnicity. (Doc. No. 31 at 19.) But that is insufficient to establish a selective enforcement claim with regard to the initial stop of Plaintiffs without any evidence related to similarly situated vehicles that Morrow ignored. As such, Plaintiffs' selective enforcement claims based on their allegations that Morrow stopped Plaintiffs based on their perceived race and national origin fail as a matter of law.

The Court finds that summary judgment also is warranted as to Plaintiffs' selective enforcement claims based on their prolonged detention. As noted above, in order to establish a selective enforcement claim, a plaintiff must demonstrate that the prosecution had a discriminatory effect. *Gardenhire*, 205 F.3d at 319 (6th Cir. 2000). "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (quoting *Armstrong*, 517 U.S. at 465). Further, "[a] claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which 'address[es] the crucial question of whether one class is being

treated differently from another class that is otherwise similarly situated.'" *Id.* (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001)).

Here, Plaintiffs again fail to provide any evidence showing that similarly situated individuals of a different race were treated differently with respect to the length of Plaintiffs' detention or any other aspect of the stop. Plaintiffs cite to Morrow's deposition testimony to support their claims, but this reliance is misplaced. For example, Plaintiffs claim that Morrow testified that he has never called Border Patrol on white or black motorists. (Doc. No. 31 at 17.) Morrow did testify that he did not remember ever calling Border Patrol when white or black suspects were involved. (Doc. No. 27-1 at 179:6-9 ("Q. Do you remember calling them on any white people? A. No. Nothing stands out in my mind. Q. Do you remember calling them on any black people? A. No.").) However, when asked, "[e]very time you've called Border Patrol, was the person you called about Latino," Morrow also responded, "I don't remember." (*Id.* at 179:3-5.) Thus, Morrow's testimony does not provide any evidence as to the race or ethnicity of the individuals that were involved when he has previously called the Border Patrol during his career. The cited testimony only demonstrates that he did not remember if those calls involved suspects of any specific racial or ethnic group.

Plaintiffs also assert that Morrow's testimony demonstrates that he chose to call Border Patrol instead of running Ivan's and Fernando's information through his computer system because of their Hispanic names. (Doc. No. 31 at 17-18.) But a review of his testimony does not support this conclusion. When asked whose names he ran through his database during the stop, Morrow stated: "I ran Paige, because she had an Ohio license, which I knew I would get information back. . . . If I would have ran -- through my experience, as soon as you run those other two gentlemen's name and DOB, it's going to pop up a bunch of different alias stuff that I'm not going to be able to sort through."

(Doc. No. 27-1 at 130:11-21.)  When later asked to expand on what he meant by the possibility of receiving a lot of aliases, he explained the difficulty of running a name like "John Smith" or "Fernando Ramirez" because the system will provide a lot of individuals with the same name that he would have to sort through.  (*Id.* at 145:3-146:16.)  Specifically, with respect to the Fernando Ramirez example, Morrow stated:  "[W]hen you run an Hispanic name and DOB, they will come back with alias hits, meaning, I don't know, let's just say Fernando Ramirez, all right, and I run that name and DOB, you're going to get a bunch of different Fernando Ramirez.  It could be another name Ramirez, different date of births."  (*Id.* at 146:3-8.)  When subsequently asked why he was "specifically concerned about that issue with Hispanic names," Morrow responded that it was based on the "specific example that we're working with here today [i.e. the Monzalvo Lazcanos].  It's not a reference to Hispanics."  (*Id.* at 146:17-147:2.)  Thus, Morrow did not testify that he refused to run Ivan's and Fernando's information because of their Hispanic names.  Instead, his testimony makes clear that he did not run their names because without a driver's license, he would get back an unworkable number of names.  Further, Morrow did, in fact, search his system for a Hispanic name during the stop, Paige Monzalvo Lazcano, because she had an Ohio license.  (*Id.* at 130:13-16.)

Finally, Plaintiffs claim that Morrow's testimony demonstrates he called Border Patrol to check on Ivan's and Fernando's immigration status because they are Hispanic, and that he would not do so for non-Hispanic drivers with no identification.  (Doc. No. 31 at 18.)  Again, this mischaracterizes Morrow's testimony.  When asked whether Morrow would contact Border Patrol on a non-Hispanic driver with no identification, Morrow ultimately answered that if he "believe[d]" the driver was a U.S. citizen, he would not call Border Patrol to identify them.  (Doc. No. 27-1 at 147:4-148:1.)  In contrast to that hypothetical situation, when Morrow called Border Patrol during

the stop, he already had ample evidence that Fernando and Ivan were not U.S. citizens, as he was aware that Fernando was in immigration proceedings and that Ivan was about to begin the immigration process.  Consequently, Morrow's testimony does not indicate that he treats similarly situated Hispanic and non-Hispanic suspects differently.

Accordingly, Plaintiffs have not identified a similarly situated individual who was treated differently or provided statistical or other evidence showing that Morrow treats Hispanic people differently from similarly situated individuals of other races.  As such, Plaintiffs cannot demonstrate that Morrow's actions had a discriminatory effect.[6]

The lack of probative evidence in support of Plaintiffs' claims also distinguishes this case from *Farm Labor*, on which Plaintiffs heavily rely.  (*See* Doc. No. 31 at 17-20.)  In *Farm Labor*, in support of a finding of discriminatory effect, the plaintiffs "introduced direct evidence that Hispanic motorists are treated differently than white motorists," including testimony from three of the defendant officers "that, in their experience, they would refer Hispanic motorists to the Border Patrol when, in precisely the same circumstances, they would not refer someone who was white (i.e., not of Hispanic appearance)."  308 F.3d at 536.  As described above, there is no such evidence in this case. Therefore, the Court will grant Morrow's Motion for Summary Judgment with respect to Plaintiffs' claims for selective enforcement.

---

[6] As a result, the Court need not address the parties' arguments regarding whether Morrow acted with a discriminatory purpose.

23

**IV.    Conclusion**

For the reasons set forth above, Morrow's Motion for Summary Judgment (Doc. No. 27) is

GRANTED.[7]

**IT IS SO ORDERED.**


                                                             _s/Pamela A. Barker_
                                                             PAMELA A. BARKER
Date:  August 17, 2020                                       U. S. DISTRICT JUDGE

---

[7] In his Motion for Summary Judgment, Morrow includes a cursory request to assess costs to Plaintiffs, presumably pursuant to 42 U.S.C. § 1988.  (Doc. No. 27 at 20.)  The Court denies Morrow's Motion in this regard, as Plaintiffs' claims were not frivolous, unreasonable, or without foundation.  *See White v. City of Ypsilanti*, No. 96-2414, 1997 WL 705253, at *2 (6th Cir. Nov. 4, 1997) ("[T]he Supreme Court has held that a prevailing defendant should recover only upon a finding by the district court that the plaintiffs['] action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.") (internal quotations and citations omitted).

24